UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO MENDOZA,

               Petitioner,                              Case Number: 05-10029

v.                                                Honorable David M. Lawson

MARY BERGHUIS,

               Respondent.

_____/

### OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Antonio Mendoza, presently confined at the Kinross Correctional Facility in Kincheloe, Michigan, has filed a *pro se* application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was found guilty but mentally ill of two counts of assault with intent to commit murder, and guilty of malicious destruction of property over $100, carrying a concealed weapon, and possession of a firearm during the commission of a felony (felony firearm) in the Ogemaw County, Michigan circuit court. He was sentenced to thirty to fifty years imprisonment for each of the assault convictions and thirty-two to forty-eight months imprisonment for the destruction of property conviction, the sentenced to be served concurrently. Those sentences are to be served consecutively to the mandatory two-year term for the felony firearm conviction, which is to be served concurrently with the forty to sixty month sentence for the carrying a concealed weapon conviction. The petitioner raises sixteen issues in his habeas petition. The respondent has filed an answer to the petition asserting that the claims lack merit because the decision of the Michigan Court of Appeals did not result in an objectively unreasonable application of clearly established Supreme Court law. The Court finds that several of the petitioner's claims lack merit, and the remaining claims are procedurally defaulted. Therefore, the petition will be denied.

I.

The petitioner's convictions arise from his assault upon Chris Mehney in August 1998 in Ogemaw County, Michigan. The petitioner was tried by a jury in July 1999. At trial, Chris Mehney testified that she was on her way home from grocery shopping when the petitioner ran his truck into her vehicle and pushed it into a ditch. Ms. Mehney exited the vehicle and tried to run, but the petitioner grabbed her arm. She screamed, and the petitioner twice hit her with the butt of his gun and shot her in the face. Ms. Mehney tried to run again, but the petitioner shot her several times.

Ms. Mehney testified that the petitioner had been a customer at Glen's Market, where she worked. She had problems with the petitioner when he came to the store. The petitioner believed that Ms. Mehney was in love with him and began stalking her. He came to the market just to see her, leaving her letters. He called her at the market and at her home, and on one occasion he followed her to a bowling alley. Ms. Mehney eventually obtained a personal protection order (PPO) against the petitioner, which he violated. After the local court issued the PPO against the petitioner, he went through the city of Rose City and hung posters containing derogatory comments about her. Ms. Mehney testified that she was never romantically involved with the petitioner.

Mary Horn, who knew Ms. Mehney through a bowling league, corroborated her testimony. She testified that she witnessed the shooting incident. She said that on August 15, 1998, as she was driving in Rose City near the intersection of Grandjean and Heath Roads, she saw a pickup truck and a Jeep driving fast. She saw the Jeep run right into the truck, forcing the truck into a ditch. Ms. Horn stopped her car and then heard a scream. She saw a woman exit the pickup truck and run up from the ditch onto the road. Ms. Horn then saw a man, whom she could not identify, shoot the woman three times. She tried to call 911 on her cellular phone but there was no service, so Ms.

Horn drove to town where she called 911.  She drove back to the scene and noticed that the truck was still there but the Jeep was gone.

 Lori Garchow corroborated Ms. Horn's and Ms. Mehney's testimony.  She testified that she was also near that intersection at the time of the shooting.  Ms. Garchow said that she saw the Jeep and the pick-up truck side-by-side underway along the road.  She then saw the Jeep run the truck off the road and saw the vehicle driven by Ms. Horn stop.  Ms. Garchow saw a man repeatedly shooting at Ms. Mehney.  She drove away and called 911.  When she returned, the Jeep was gone.  Ms.Garchow gave a statement to the police.  She testified that it looked to her like the man who was shooting at Ms. Mehney was in some sort of trance.

Rusty Weston testified that he was driving in the area with two friends when he witnessed the shooting.  He saw a man shoot at Ms. Mehney and then kick and hit her.  He drove away and called the police.  Eric McKellar was in the car with Mr. Weston and identified the man shooting at Ms. Mehney as the petitioner.

Jeff Erickson, the officer in charge of the case from the Ogemaw Sheriff's Department, testified that he went to the scene of the incident and took pictures of Ms. Mehney's truck.  He found spent bullets and shell casings, along with part of the gun.  After he learned that the petitioner had been identified as the Jeep driver, Officer Erickson drove to the petitioner's residence.  Officer Erickson attempted to contact the petitioner through the patrol cruiser's loudspeaker, but no one responded.  He saw the Jeep outside the house.  Because no one responded to the loudspeaker call, Officer Erickson sought a warrant.  After a warrant was obtained, the petitioner's home was searched.

Officer Erickson took pictures of the Jeep and noted that it had paint transfer on it matching the paint from Ms. Mehney's pick-up truck, and vice versa. He also found portions of the gun found at the scene of the shooting in a well near the petitioner's home. The emergency response team and the tracking dogs found the petitioner in the woods outside of his residence.

Officer Erickson was aware that there was previous contact between the petitioner and Ms. Mehney and that a PPO was in place. It was his testimony that the petitioner had been to the state police office to report that Ms. Mehney was stalking him. Officer Erickston testified that the petitioner believed Ms. Mehney was in love with him. However, an investigation proved that the petitioner's story was not true. The petitioner told Officer Erickson that Ms. Mehney had him arrested and banned from Glen's Market, where she worked. The petitioner also told Officer Erickson that Ms. Mehney drove past his home and tried to run him off the road, and that he believed Ms. Mehney's friends were after him.

The petitioner testified in his own defense. He said that he met Ms. Mehney while shopping at Glen's Market and later saw her at a gas station. He continued to see her when he went to the market and eventually ran into her at a local bar. The petitioner testified that Ms. Mehney drove past his house, and on one particular day, she drove by approximately ten times. It was the petitioner's testimony that Ms. Mehney once tried to hit his grocery cart with a dolly, and he said that she always harassed him while he was shopping at the market. The petitioner testified that he wrote Ms. Mehney a note and told her personally that he was going to tell her manager if she continued to harass him. He told his family about the harassment. The petitioner said that he confronted Ms. Mehney about the harassment but that she denied driving past his residence, which made him angry. The petitioner believed that Ms. Mehney liked him.

-4-

The petitioner testified that he had taken some medication on the day of the incident, including Tylenol 3, Vicodin, and Soma. He went to a laundromat to wash his clothes and then to a bar, where he had about five beers. He returned to the laundromat to pick up his clothes. According to the petitioner, Ms. Mehney cut him off with her truck when he was driving away from the laundromat, which made him angry. The petitioner did not remember hitting Ms. Mehney's vehicle or shooting at her. The next thing he remembered was being back at his residence, walking in the woods with a gun in his hand. He said that he went to sleep in the woods that night and woke up when a police dog jumped on him. He remembered being arrested, but he did not remember going to the hospital that night for treatment of a dog bite. The petitioner testified that Ms. Mehney drove by the county jail after his arrest many times and brought other people with her, particularly men, just to make him jealous. He said that his failure to return her affections is what led her to harass him.

Almsa Le Dezma, the petitioner's sister, testified that the petitioner repeatedly had spoken with her about Ms. Mehney. She said that he initially called her once a day to talk about Ms. Mehney, but then the telephone calls increased in number to three or four per day. The petitioner told his sister that Ms. Mehney was stalking him because she was in love with him. Ms. Le Dezma testified that her family considered having the petitioner committed to a mental institution because of his obsession with Ms. Mehney.

Ronaldo Mendoza, the petitioner's brother, testified that he believed that his brother was obsessed with Ms. Mehney. He said that the petitioner called him every day and told him that Ms. Mehney was in love with him. The petitioner also told his brother that Ms. Mehney was driving by the jail to see him.

Dr. Steven Miller, a forensic psychologist, testified that the petitioner told him that he was stalked by Ms. Mehney and that she was in love with him. Dr. Miller said that the petitioner's beliefs were a delusion and that he was obsessed with Ms. Mehney. Dr. Miller diagnosed the petitioner with a delusional disorder and gave his opinion that the petitioner was mentally ill according to the legal definition. He said that the petitioner lived in a fantasy world as it related to Ms. Mehney. As to the petitioner's memory loss regarding the incident, Dr. Miller said that the beer and drugs consumed by the petitioner could explain the memory loss.

Dr. David Schneider, an expert in the field of pharmacology, testified that the combination of drugs and alcohol taken by the petitioner could have caused the petitioner to become psychotic and/or catatonic. Dr. Schneider testified that Soma, Elavil, and alcohol affect a person's ability to reason and can prevent an individual from forming the necessary intent to commit the crime with which the petitioner was charged. Dr. Schneider testified that on the day of the incident, the petitioner's blood alcohol level was between .08 and .12 milligrams per deciliter.

After the defense rested, the prosecution called Deputy Sheriff William Lawrence as a rebuttal witness. He testified that he and a K-9 unit found and arrested the petitioner. Officer Lawrence testified that he transported the petitioner to the hospital for treatment of the dog bite. He said that he did not smell alcohol on the petitioner and the petitioner did not appear to be under the influence of drugs. Officer Lawrence testified that months later the petitioner told him that he would have killed Ms. Mehney if his gun had not broken. Officer Lawrence admitted that he never documented that statement by the petitioner.

Donna Kelland, an expert in criminal psychology, testified that she interviewed the petitioner on several occasions. She testified that she believed that the petitioner was capable of forming the

necessary intent at the time of the offense and that he was not mentally ill, did not suffer from diminished capacity, and was not mentally challenged. She also testified that he was not insane. Ms. Kelland admitted that there was a question regarding whether the petitioner was intoxicated at the time of the offense and she conceded that he had narcisstic tendencies. She acknowledged that her report of her meeting with the petitioner stated that the petitioner was an alcoholic and was taking drugs at the time of the incident. Ms. Kelland did not disagree that the combination of drugs and alcohol the petitioner claimed to have taken could prevent the petitioner from forming the specific intent to commit some of the charged crimes.

As noted above, the jury found the petitioner guilty but mentally ill of two counts of assault with intent to commit murder. The jury also found the petitioner guilty of malicious destruction of property over $100, carrying a concealed weapon, and felony firearm. In October 1999, the petitioner, through counsel, filed an appeal with the Michigan Court of Appeals raising the following claims:

I.    Conviction of [the petitioner] on both count I (assault with intent to murder) and count II (assault with intent to murder) constituted double jeopardy when both counts arose out of the same transaction or occurrence.

II.   [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendments V and XIV, when he was presented to the jury in leg irons, despite the fact that he posed no threat of violence, flight or disruption to the court.

III.  The jury's verdict of guilty on three counts and guilty but mentally ill on two counts were inconsistent verdicts mandating reversal or modification of [the petitioner's] convictions.

IV.   [The petitioner] is entitled to re-sentencing because the sentence imposed exceeded the guidelines with an arbitrarily imposed sentence that is disproportionate to this offender.

The petitioner also filed a supplemental brief *pro se* in the Michigan Court of Appeals raising the following additional claims:

I.     [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendment VI, alleging that the trial court erred in not changing venue *sua sponte* because of pretrial publicity and proven, widespread communal rage that affected [the petitioner's] right to a fair and impartial jury.

II.    [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendments V, VI, and XIV, on the court's prejudicial bias against [the petitioner] on the right of an impartial and unbiased court.

III.   [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendments V, VI, and XIV, due to prosecutorial misconduct so prejudicial that it resulted in manifest injustice.

IV.    [The petitioner's] rights were violated in violation of the United States Constitution, Amendment IV, due to an illegal search and seizure.

V.     [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendments VI and XIV, for the trial court's failure to instruct on lesser necessary included offenses.

VI.    [The petitioner] was denied a fair trial in violation of the United States Constitution, Amendments VI and XIV, as counsel was ineffective and his conduct was prejudicial to [the petitioner].

On July 20, 2001, the Michigan Court of Appeals issued an unpublished *per curiam* opinion affirming the petitioner's convictions. *People v. Antonio Mendoza*, No. 222549, 2001 WL 824467 (Mich. Ct. App. July 20, 2001). The petitioner then filed a delayed application for leave to appeal in the Michigan Supreme Court raising the same claims raised in the Michigan Court of Appeals, and adding the following two new issues:

I.     [The petitioner] contends that the trial court's adverse rulings constituted cumulative error, thus causing the petitioner in not receiving a fair trial.

-8-

II.     That convictions of malicious destruction of property and carrying concealed weapon are violations of double jeopardy when both counts arose out of the same transaction or occurrence.

On March 4, 2002, the Michigan Supreme Court denied the petitioner's delayed application for leave to appeal. *People v. Antonio Mendoza*, 465 Mich. 960, 641 N.W.2d 856 (2002). Subsequently, the petitioner filed a motion for relief from judgment with the trial court raising the following claims:

I.      The trial court's failure to correct [the petitioner's] pre-sentence report violated his Sixth and Fourteenth Amendment rights of confrontation and due process.

II.     Conviction of [the petitioner] on five counts, I and II (assault with intent to murder) and count IV (malicious destruction of property) and conviction of [the petitioner] on both count III (felony firearm) and count V (carrying a concealed weapon) constituted double jeopardy when all counts arose out of the same transaction or occurrence.

III.    Re-sentencing of [the petitioner] should be granted due to the Constitutional violations of the V, VI, VII, and the XIV Amendments.

        A.      [The petitioner's] rights were violated under the double jeopardy and due process clause when jail credit, concurrent sentence were proved after sentence.

IV.     [The petitioner] not receiving an accurate account of voir dire and counsel's ineffectiveness, denied him his Sixth Amendment right to a fair and impartial trial and a fair appeal.

V.      The second guilty count of M.C.L. § 768.38, also known as guilty but mentally ill, is a violation of the United States Constitution, Amendment V, of being placed twice in jeopardy and Amendment VI, of receiving a fair trial.

On January 30, 2003, the trial court issued an order denying the petitioner's motion for relief from judgment. The petitioner then filed a delayed application for leave to appeal in the Michigan Court of Appeals. On July 9, 2004, the Michigan Court of Appeals denied his application. *People*

*v. Antonio Mendoza*, No. 253191 (Mich. Ct. App. July 9, 2004). The petitioner filed an application

for leave to appeal in the Michigan Supreme Court, which was denied on December 29, 2004

because the petitioner failed to meet the burden of establishing entitlement to relief under Mich. Ct.

R. 6.508(D). *People v. Antonio Mendoza*, 471 Mich. 955, 690 N.W.2d 113 (2004). Thereafter, the

petitioner filed the pending petition for a writ of habeas corpus and presents the following claims:

I. The petitioner's conviction was obtained in violation of the United States Constitution Fifth Amendment double jeopardy clause.

II. The petitioner was denied a fair trial because the jurors viewed him in his leg shackles.

III. The petitioner was denied a fair trial because the jurors failed to follow the law by issuing an inconsistent verdict to all his counts.

IV. The petitioner's sentence was cruel and unusual punishment.

V. The petitioner's conviction was obtained by action of a petit jury which was unconstitutionally selected and impaneled.

VI. The petitioner's conviction was obtained by action of a trial court judge who had personal bias against him and thus denied him a fair and impartial trial.

VII. The petitioner's conviction was obtained by prosecutorial misconduct, prejudicing him, and thus resulting in manifest injustice.

VIII. The petitioner's conviction was obtained by the admission of evidence that was gained pursuant to an unconstitutional search and seizure.

IX. By failing to include lessor charges, the petitioner was denied a fair trial in violation of the Sixth and Fourteenth Amendments.

X. The petitioner was denied the effective assistance of counsel in violation of his Sixth Amendment rights.

XI. The trial court erred in denying the petitioner the right to correct his pre-sentence report, thus violating his due process rights.

XII. The petitioner's conviction was obtained in violation of the double jeopardy clause. (Same as claim I).

XIII.    The petitioner's re-sentencing violated the double jeopardy clause.

XIV.    On the basis of his record, the petitioner's sentence was cruel and unusual punishment.  (Same as claim IV).

XV.    Denial of complete and accurate trial transcript and denial of effective assistance of appellate counsel violated the petitioner's constitutional rights.

XVI.    Finding the petitioner guilty as charged and guilty but mentally ill is a violation of the double jeopardy clause.  (Same as claims I and XII).

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law.  *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998).  Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21

-11-

(internal quotes omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).  Additionally, this

Court must presume the correctness of state court factual determinations.  28 U.S.C. § 2254(e)(1)

(providing that in habeas corpus proceedings by state prisoners, "a determination of a factual issue

made by a State court shall be presumed to be correct"); *see also Austin v. Jackson*, 213 F.3d 298,

300 (6th Cir. 2000) (stating that "[a]ll factual findings by the state court are accepted by this Court

unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary to"

clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly
> established precedent if the state court applies a rule that contradicts the governing
> law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established
> precedent if the state court confronts a set of facts that are materially
> indistinguishable from a decision of this Court and nevertheless arrives at a result
> different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus

relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision

unreasonably applies the law of this Court to the facts of a prisoner's case."  *Id*. at 409.  The Court

defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask
> whether the state court's application of clearly established federal law was
> objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect*
> application of federal law. . . .  Under § 2254(d)(1)'s "unreasonable application"
> clause, then, a federal habeas court may not issue the writ simply because that court
> concludes in its independent judgment that the relevant state-court decision applied

-12-

clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 409, 410-11.  *See also King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

## A.

In his first claim, the petitioner argues that he is entitled to habeas corpus relief because his two convictions for assault with intent to commit murder violate double jeopardy protections.  The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  This constitutional provision protects individuals not only from successive trials, but also prohibits multiple punishments for the same offense.  *Hampton v. Hobbs*, 106 F.3d 1281, 1288 (6th Cir. 1997).  However, "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause."  *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1981).  *See also United States v. Kuhn*, 165 F. Supp. 2d 639, 642 (E.D. Mich. 2001).

The petitioner contends that the two charges arose out of the same transaction or occurrence, and therefore convictions on both counts violated his right to be free from double jeopardy. Certainly, if both of the petitioner's assault with intent to commit murder convictions arose from a single act against Ms. Mehney, then the Double Jeopardy Clause likely would bar the finding of two violations of the same statute.  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (holding that the Double Jeopardy Clause "protects against multiple punishments for the same offense") (footnotes omitted); *see also Ohio v. Johnson*, 467 U.S. 493, 497-98 (1984).

-13-

The state court of appeals, however, observed that the petitioner's two assault with intent to commit murder convictions did not arise from the same act. Rather, the state court found that the convictions arose from separate acts of assault:

> In our view, defendant's two convictions for assault with intent to commit murder do not implicate double jeopardy concerns because they did not arise out of the "same transaction." See *People v White*, 212 Mich App 298, 305-306; 536 NW2d 876 (1995). "The same transaction test requires that prosecutors join at one trial all the charges against a defendant arising out of a single criminal act, occurrence, episode or transaction." *Id.* at 306 (citation omitted). Because defendant's assault convictions arose out of two "distinct occurrences or episodes" we conclude that these convictions do not violate his double jeopardy rights. *Id.*
>
> Evidence at trial revealed that defendant used his own vehicle to force the victim's vehicle off of the road and into a ditch. Defendant then got out of his car and chased the victim with a gun when she attempted to flee. When defendant caught up with the victim, he shot her three times. Because the act resulting in the first assault with intent to commit murder conviction was complete before the act leading to the second assault with intent to commit murder conviction occurred, defendant's double jeopardy rights have not been violated. *People v Lugo*, 214 Mich App 699, 708-709; 542 NW2d 921 (1995) ("There is no violation of double jeopardy protections if one crime is complete before the other takes place, even if the offenses share common elements or one constitutes a lesser offense of the other.") (citation omitted).

*People v. Mendoza*, 2001 WL 824467, at *5. It appears therefore that the petitioner was convicted of two counts of assault with intent to commit murder based on two separate criminal acts, each subject to punishment by the Michigan legislature. The finding that the petitioner committed two distinct acts is a factual conclusion entitled to the presumption of correctness. 28 U.S.C. § 2254(e)(1); *Austin*, 213 F.3d at 300. Two convictions under those factual circumstances do not violate the Double Jeopardy Clause. *See Kuhn*, 165 F. Supp. 2d at 646-47.

The conclusion of the Michigan Court of Appeals that the petitioner's two convictions for assault with intent to commit murder were based on two separate acts was not contrary to, nor did

-14-

it constitute the unreasonable application of, federal law as determined by the Supreme Court. The

petitioner, therefore, is not entitled to habeas relief on this claim.

B.

In his second habeas claim, the petitioner alleges that he was denied a fair trial because some

jury members saw him with leg shackles. The petitioner raised this claim in his direct appeal but

the Michigan Court of Appeals rejected it, stating:

> Defendant also contends that reversal of his convictions is required because
> four members of the jury observed defendant wearing leg irons outside of the
> courtroom. A trial court's decision to restrain a defendant is reviewed by this Court
> "for an abuse of discretion under the totality of the circumstances." *People v Dixon*,
> 217 Mich. App. 400, 405; 552 NW2d 663 (1996). We recognize that freedom from
> shackles during trial is an important element of a fair and impartial trial. See *People
> v Dunn*, 446 Mich. 409, 426; 521 NW2d 255 (1994). Thus, the shackling of a
> defendant during trial is allowed only in "extraordinary circumstances" to the extent
> that it may (1) prevent the defendant's escape, (2) prevent the defendant from
> injuring other individuals in the courtroom, or (3) to foster an orderly trial. *Dixon,
> supra* at 404. A trial court must clearly set forth its finding of necessity on the
> record. *Dunn, supra* at 426.
>
> Before voir dire, the prosecutor argued that defendant should be shackled
> because the sheriff's department had deemed him a flight and security risk based on
> a series of incidents during defendant's incarceration. When defense counsel
> objected to the shackling of defendant, the trial court explained its decision in the
> following terms:
>
>> Well, I was contacted by the Ogemaw County clerk's office
>> yesterday. There was [a] request by the sheriff for to [sic] security
>> reasons to have your defendant shackled. I indicated – they wanted
>> wrist and leg manacles. And I indicated that I felt that leg manacles
>> were appropriate. I thought that the skirting would be the best way
>> to go and I note that the skirting is on both the prosecution table and
>> the defense table.
>
> The trial court went on to note that every effort would be made to ensure that
> the jury did not observe defendant in manacles en route to the courtroom. On this
> record, we find no abuse of discretion. See *People v Johnson*, 160 Mich. App. 490,
> 494; 408 N.W.2d 485 (1987).
>
> Likewise, we reject defendant's claim that reversal is required because
> members of the jury inadvertently viewed defendant in shackles as he was being
> brought into the courtroom. Defense counsel subsequently moved for a mistrial on
> this basis, which the trial court denied. In our view, reversal of defendant's

-15-

convictions is not warranted because the rule prohibiting the manacling of a defendant absent extraordinary circumstances does not extend to safety precautions taken by court security when a defendant is not in the courtroom. *People v Panko*, 34 Mich. App. 297, 299-300; 191 NW2d 75 (1971); see also *People v Robinson*, 172 Mich. App. 650, 654; 432 NW2d 390 (1988) (holding that the defendant did not suffer prejudice requiring reversal where "there was reason to believe [the] defendant was a flight risk and the leg restraints were unobtrusive.").

*People v. Mendoza*, 2001 WL 824467, at *1-2.

There is abundant Supreme Court precedent addressing the subject of courtroom restraints. In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' – such as the interest in courtroom security – specific to the defendant on trial." *Id.* at 624. The *Deck* Court found that this rule was "clear" as it applied to proceedings during the guilt phase based on prior Supreme Court cases holding that a criminal defendant may not be shackled in front of the jury absent extraordinary circumstances. *See Illinois v. Allen*, 397 U.S. 337, 344 (1970) (holding that "no defendant should be tried while shackled and gagged except as a last resort"); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (holding that requiring a criminal defendant to wear a prison uniform in front of the jury is "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial"); *Estelle v. Williams*, 425 U.S. 501, 505 (1976) (holding that defendants may not be presented to the jury so that "an unacceptable risk is presented of impermissible factors coming into play" where to do so "furthers no essential state policy"). The *Deck* Court held that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635.

-16-

*Deck* forbids only the use of visible shackles during the guilt and penalty phases of courtroom proceedings. The Supreme Court has not addressed the use of shackles when a criminal defendant in police custody is being moved about the courthouse. *See United States v. Halliburton*, 870 F.2d 557, 560 (9th Cir. 1989) (observing that "[t]he Supreme Court has not been presented with the question whether a brief and inadvertent observation by jurors of a defendant in handcuffs outside the courtroom compels an automatic reversal"). Lower courts to consider the issue have concluded that such an occurrence does not violate due process unless the petitioner can show prejudice. "Most courts now agree . . . that a defendant is not denied a fair trial and is not entitled to a mistrial solely because he was momentarily and inadvertently seen in handcuffs by jury members." *State v. Jones*, 130 N.J. Super. 596, 602, 328 A.2d 41, 44 (N.J. Super. Ct. 1974) (collecting cases); *see also United States v. Crane*, 499 F.2d 1385, 1389 (6th Cir. 1974) (where the court "recognized the inherent prejudice to a defendant required to be manacled or shackled while in the courtroom during his trial," but "adopted a somewhat different standard in cases where the defendant had been seen by the jurors in shackles only for a brief period somewhere in the courthouse"); *United States v. Williams*, 809 F.2d 75, 83 (1st Cir. 1986) (holding "that the jury's inadvertent observation outside the courtroom of a defendant in custody does not 'dilute [the] presumption of innocence' so as to require a new trial unless there is a showing of actual prejudice"); *Wright v. State of Texas*, 533 F.2d 185, 187 (5th Cir. 1976) ("We have consistently held that a brief and fortuitous encounter of the defendant in handcuffs by jurors is not prejudicial and requires an affirmative showing of prejudice by the defendant."); *Allen v. Montgomery*, 728 F.2d 1409, 1413 (11th Cir. 1984) (holding that defendant's rights were not violated where "potential

-17-

jurors gathered only a brief glimpse of Allen in handcuffs," which "were removed as soon as he was brought into the courtroom").

There is no evidence in this case that visible shackles were used to restrain the petitioner during the trial proceedings. Rather, the state court record shows that some but not all of the jurors observed the petitioner briefly outside the courtroom wearing leg shackles. The observations apparently were brief and isolated. It is reasonable for law enforcement officers to transport custodial criminal defendants to and from courthouses across the country with restraints. Because the trial court concluded that the petitioner presented a flight risk, the use of restraints as the petitioner was being brought into and out of the courthouse was justified by the State's interest in courtroom security occasioned by particularized concerns about the petitioner based on his past conduct. *See Deck*, 544 U.S. at 624.

Nor has the petitioner demonstrated prejudice, since he has not shown that the brief exposure to some of the jurors outside the courtroom "had a substantial and injurious effect in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). The decisions of the state courts that the petitioner's due process rights were not violated by the brief and inadvertent viewing of the petitioner in leg shackles outside the courtroom were neither contrary to nor an unreasonable application of United States Supreme Court law. The petitioner is not entitled to habeas relief on this claim.

C.

-18-

In his third claim, the petitioner alleges that the jury's verdicts of guilty but mentally ill on two counts are inconsistent with the verdicts of guilty on the other three counts and may not stand. The Michigan Court of Appeals, the last state court to issue a reasoned opinion, stated:

> On appeal, defendant contends that his felony-firearm, malicious destruction of property and CCW convictions should be modified or reversed because they are inconsistent with the accompanying guilty but mentally ill verdicts for assault with intent to commit murder. We disagree. Inconsistent jury verdicts are permissible in Michigan and therefore do not provide a basis for reversal. *People v Vaughn*, 409 Mich. 463, 466; 295 N.W.2d 354 (1980); *People v Lewis*, 415 Mich. 443, 449-450; 330 N.W.2d 16 (1982). As our Supreme Court observed in *People v Garcia*, 448 Mich. 442, 464; 531 N.W.2d 683 (1995) (Riley J.), "[t]here is no reason to vacate [a] conviction merely because the verdicts cannot rationally be reconciled." *Id.*, quoting *United States v Powell*, 469 U.S. 57; 105 S Ct 471; 83 L.Ed.2d 461 (1984)

*People v. Mendoza*, 2001 WL 824467, at *1.

"Inconsistency in a verdict is not a sufficient reason for setting it aside." *Harris v. Rivera*, 454 U.S. 339, 345 (1981); *see also Dunn v. United States*, 284 U.S. 390, 392 (1932) (observing that "[t]he most that can be said in such cases is that the verdict shows that [in] either [conviction] the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt"). That an inconsistent verdict may favor a criminal defendant as well as a prosecutor "militates against review of such convictions at the defendant's behest." *United States v Powell*, 469 U.S. 57, 65 (1984). The fact that an inconsistent verdict might be the result of lenity on the part of the fact finder, coupled with the fact that the prosecutor is unable to obtain appellate review of a conviction, "suggests that inconsistent verdicts should not be reviewable." *Ibid.*

There also is the question whether these verdicts actually are inconsistent. Under Michigan law, a guilty but mentally ill verdict "does not absolve a defendant of criminal responsibility." *People v. Stephan*, 241 Mich. App. 482, 491, 616 N.W.2d 188 (2000). As with a plain guilty verdict, a defendant found guilty but mentally ill is subject to punishment. The jury's finding that

-19-

the defendant was mentally ill with respect to the assaults but not the other crimes does not diminish the State's authority to curtail the petitioner's liberty, nor does it undermine the finding of guilt as to all the charges.

Because the United States Supreme Court has held that inconsistent verdicts are constitutionally tolerable, and because the inconsistency is insignificant on the overarching issue of guilt, the Michigan Court of Appeals' affirmance of the petitioner's convictions was not an unreasonable application of clearly established federal law. The petitioner is not entitled to habeas relief on this claim.

D.

The petitioner's fourth and fourteenth claims for relief are that his sentence violates the Eighth Amendment. A habeas petitioner who seeks to challenge the severity of a prison sentence on Eighth Amendment grounds faces a formidable challenge. Generally, he may obtain relief only by demonstrating that a state court decision contravened or misapplied "clearly established" Supreme Court precedent. However, the Supreme Court has acknowledged "that our precedents in this area have not been a model of clarity." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003). "Indeed, in determining whether a particular sentence for a term of years can violate the Eighth Amendment, we have not established a clear or consistent path for a court to follow." *Ibid.* The Supreme Court declared that the general applicability of the proportionality standard to term-of-years sentences was clearly established, but confessed a lack of clarity as to the factors lower courts should consider in making that determination. *Ibid.* The Court concluded that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross

-20-

disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73. This is not one of those cases.

In *Lockyer*, the Supreme Court reversed the Ninth Circuit's grant of a writ of habeas corpus on the ground that two twenty-five-years-to-life sentences imposed under California's "three strikes" law, where the triggering felony was the theft of $150 worth of video tapes, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment. The Court noted that the "thicket" created by its jurisprudence consisted primarily of its decisions in *Solem v. Helm*, 463 U.S. 277 (1983), *Harmelin v. Michigan*, 501 U.S. 957 (1991), and *Rummel v. Estelle*, 445 U.S. 263 (1980). The California state court observed that the proportionality rule set forth in *Solem* was cast into doubt by *Harmelin* and proceeded to analyze Andrade's sentence under the approach taken in *Rummel*, where the Supreme Court rejected a claim that a life sentence imposed under Texas' recidivist statute was grossly disproportionate to the theft felonies that formed the predicate for the sentence. The California court concluded that Andrade's sentence was not disproportionate. The Supreme Court held that the decision was not contrary to or an unreasonable application of federal law that was clearly established by the Supreme Court. *Lockyer*, 538 U.S. at 72-77.

A plurality of the Supreme Court has held that the Eighth Amendment does not require strict proportionality between the crime and sentence. *See Harmelin*, 501 U.S. at 965. As the Supreme Court observed in *Lockyer*, it is generally recognized after *Harmelin* that the Cruel and Unusual Punishment Clause of the Eighth Amendment forbids only an extreme disparity between crime and sentence, that is, sentences that are "grossly disproportionate" to the crime. *Id.* at 1001 (Kennedy, J., concurring); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001) (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)); *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991).

-21-

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel*, 445 U.S. at 272. Rummel was convicted of obtaining $120.75 by false pretenses, a crime punishable by at least two years but not more than ten years in prison. He was sentenced as a recidivist to life imprisonment with the possibility of parole. His two prior felonies consisted of fraudulent use of a credit card to obtain $80 worth of goods and services, a felony punishable by two to ten years in prison; and passing a forged check for $28.36, a crime punishable by two to five years in prison. The Supreme Court held that Rummel's life sentence under the state recidivist statute did not constitute cruel and unusual punishment. In *Harmelin*, the Supreme Court upheld a life sentence without the possibility of parole for possession of more than 650 grams of cocaine for an offender with no prior felony convictions.

The Supreme Court overturned a life sentence in *Solem* on the ground that it was significantly disproportionate to Helm's crime and therefore prohibited by the Eighth Amendment. However, Helm had been sentenced to life imprisonment without the possibility of parole for uttering a "no account" check for $100, and his prior felonies also were minor, nonviolent crimes. By contrast, the Supreme Court reaffirmed *Rummel* and found constitutional a sentence of twenty-five years to life imposed upon a fifth felony conviction. *See Ewing v. California*, 538 U.S. 11, 24-31 (2003).

In this case, the Court does not believe that the petitioner's sentence of thirty to fifty years imprisonment for each assault conviction violated the Eighth Amendment. The sentencing court noted that the petitioner stalked and harassed the victim for two years prior to the assault, violated a PPO issued by the state court, showed no remorse for his actions, and blamed the victim for the incident. The court believed there was little potential for rehabilitation. The sentencing court's

-22-

justification for the lengthy prison term was rational in light of the record in this case. Because the Supreme Court in *Harmelin v. Michigan*, 501 U.S. 957 (1991), found a life sentence without parole for the possession of cocaine to be constitutional, the petitioner's sentence of thirty to fifty years imprisonment for the assault with intent to murder is not extreme or grossly disproportionate to the crime.

Moreover, Michigan law allowed a prison term of life or any number of years for this offense. Mich. Comp. Laws § 750.83. The challenged sentence fell within the maximum sentence set by state law, and "a sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995) (citation omitted). "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.'" *Austin v. Jackson*, 213 F.3d 298, 301 (6th Cir. 2000) (quoting *Williams v. People of State of New York*, 337 U.S. 241, 245 (1949)). There is no Eighth Amendment violation in this case.

E.

In his fifth habeas claim, the petitioner alleges that he was denied due process when the trial court failed to grant his motion for change of venue because of the "pretrial publicity" and "wide-spread communal rage" regarding his case. The Michigan Court of Appeals rejected this claim.

The United States Supreme Court has held that a court should grant a defendant a change of venue if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722-24 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*,

-23-

169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs in a case where an inflammatory, circus atmosphere pervades both the courthouse and surrounding community. *Ritchie*, 313 F.3d at 952-53; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000); *Nevers*, 169 F.3d at 362-63; *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc). For that presumption to apply, the trial must be entirely lacking in the solemnity and the sobriety required of a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Gall*, 231 F.3d at 310; *Nevers*, 169 F.3d at 363. Cases where prejudice from pretrial publicity is presumed are extremely rare, and even pervasive, adverse publicity does not inevitably lead to an unfair trial. *DeLisle*, 161 F.3d at 382.

In a case where pretrial publicity cannot be presumed to be prejudicial, the trial court must still determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for determining if actual prejudice has occurred is a searching voir dire of prospective jurors. *Ibid.* The court must review the media coverage itself and the substance of the jurors' statements at voir dire to determine whether a "community-wide sentiment" exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of a prospective juror's impartiality. *Id.* at 366-67. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Ritchie*, 313 F.3d at 962.

Here, the Michigan Court of Appeals rejected the petitioner's claim, stating:

-24-

Our Supreme Court considered the issue of pretrial publicity as it relates to a defendant's right to a fair trial in *Jendrzejewski, supra*:

> Juror exposure to . . . newspaper accounts of the crime for which [the defendant] has been charged does not in itself establish a presumption that a defendant has been deprived of a fair trial by pretrial publicity. "To resolve [such a] case," a reviewing court "must turn . . . to any indications in the totality of the circumstances that [the defendant's] trial was not fundamentally fair." [*Id.* at 502, quoting *Murphy v Florida*, 421 US 794, 799 (1975).]

In the instant case, the lower court record contains four articles published in the local community newspaper that relate to this case. Having reviewed these articles, we are not persuaded that "the content of the pretrial publicity . . . reflect[s] . . . a barrage of inflammatory publicity leading to a pattern of deep and bitter prejudice against [] defendant, or a carnival-like atmosphere surrounding the proceedings." *Id.* at 506-507 (internal quotation marks and citations omitted) (footnote omitted). For the most part, the articles contained factual accounts of the court proceedings leading to defendant's trial, and there is no "suggestion of appeal to a lynch mob mentality." *Id.* at 504 (internal quotation marks omitted).

Moreover, our independent review of the voir dire does not yield any indication that defendant was denied a fair trial. See *Jendrzejewski, supra* at 517 ("The reviewing court must also closely examine the entire voir dire to determine if an impartial jury was impaneled."). The potential jurors in this case were thoroughly questioned to allow challenges for cause and peremptory challenges to be exercised intelligently. *Id.* at 509. Although some of the impaneled jurors admitted having previously heard about the case through the media, each stated that they could discard any preexisting knowledge and opinions, and decide the case solely on the evidence at trial. The reasoning of the *Jendrzejewski* Court is therefore instructive.

> In this state, as in the United States Supreme Court, the general rule holds that if a potential juror, under oath, can lay aside preexisting knowledge and opinions about the case, neither will be a ground for reversal of a denial of a motion for a change of venue. [*Id.* at 517, citing *People v DeLisle*, 202 Mich. App. 658, 662; 509 NW2d 885 (1993).]

In our opinion, a review of the record does not yield any indication that defendant's trial was "not fundamentally fair." *Id.* at 502. Consequently, the trial court did not abuse its discretion in denying defendant's motion for a change of venue.

*People v. Mendoza*, 2001 WL 824467, at *2-3.

A review of the transcript in this case reveals that the trial court did not err in denying the petitioner's motion. Although there may have been some articles in the local community newspaper that related to the case, juror exposure to those accounts did not establish a presumption that the

petitioner was denied a fair trial because of pretrial publicity. The potential jurors in this case were extensively questioned by the attorneys and the court to determine if they could be impartial and lay aside any preexisting knowledge and opinions, if any existed. The trial court also repeatedly instructed the venire that any publicity or articles about the case was not evidence and was not to be considered. None of the jurors seated in the case stated that he or she was unable to disregard prior accounts in the media, and each expressed the ability to judge the case solely on the evidence introduced at trial.

The Michigan Court of Appeals' decision, therefore, is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Therefore, the petitioner is not entitled to habeas relief on this claim.

## F.

The petitioner next asserts that he was denied a fair trial due to various instances of prosecutorial misconduct. The petitioner contends that the prosecutor (1) improperly seized money from him, (2) set up a sting operation to get him to hire a jailhouse informant to kill the victim, (3) threatened to charge his sister with conspiracy if he did not plead guilty, (4) suborned perjury by eliciting testimony from a deputy sheriff that the petitioner confessed even though the deputy never filed a report, (5) failed to identify a witness before trial, and (6) attempted to influence the jurors by seating the victim's family close to the jury box. The Michigan Court of Appeals reviewed these claims on the merits, although it applied a plain error standard to some of them because the petitioner did not object during trial. The court of appeals concluded that none of the alleged errors warranted reversal.

-26-

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974); *Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (stating that "[p]rosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation"). The determination whether the trial was fundamentally unfair is "made by evaluating the totality of the circumstances surrounding each individual case." *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The Court must focus on "'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The first question to consider is whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the court must consider whether the improper acts were so flagrant as to warrant reversal. *Id.* at 516. The Sixth Circuit has identified four factors to consider when analyzing conduct for flagrancy: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)).

"[T]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle*, 457 F.3d at 516 (alteration in original) (quoting *Donnelly*, 416 U.S. at 645).  Such claims are subject to the harmless error analysis of *Brecht v. Abrahamson*, which held that an error alleged on habeas is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 638; *see Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

The petitioner has failed to submit sufficient information for the Court to conclude that the prosecutor improperly seized money from him.  The habeas petition states that the "Prosecutor in overstepping his role for the State, went and seized money from me.  On another case to insure accuser will receive compensation, he did so without informing me, the reason for the seizure found out misconduct in local newspaper, him quoting took money for future civil suit."  Pet. at 7.  The petitioner's reply to the respondent's response adds that "the prosecutor failure to notify petitioner of pleading, to seized restitution owed to him."  Pet. Reply Br. at 26.  The Court is unable to discern from these accusations a constitutional violation that rendered the petitioner's entire trial fundamentally unfair.

The petitioner also claims that the prosecutor attempted to set him up to make inculpatory statements to a jailhouse informant named Mark Cox, Sr.  However, the Court cannot find any indication that someone by that name testified at his criminal trial or that any evidence was presented describing statements made by the petitioner while in jail.  The petitioner further claims that the prosecutor threatened to charge his sister with conspiracy if he did not plead guilty.  However, the petitioner did not plead guilty.  Because prosecutorial misconduct warrants habeas

-28-

relief only when it renders the entire trial fundamentally unfair, any out-of-court actions by the prosecutor that did not affect his trial do not violate the petitioner's constitutional rights. The Court finds that none of these alleged actions by the prosecutor resulted in a fundamentally unfair trial.

The petitioner also alleges that the prosecutor suborned perjury by introducing the testimony of Deputy William Lawrence and failed to disclose before trial that Lawrence would testify. Deputy Lawrence testified in the State's rebuttal case about a statement the petitioner made to him four months after his arrest. Lawrence said that the petitioner told him, "If my gun hadn't broke, I would have killed the bitch." Trial Tr. vol. IV, 629, July 23, 1999. As evidence that Lawrence was lying, the petitioner points to the fact that Lawrence never filed a "Confession Report."

"The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.3d 817, 822 (6th Cir. 1989)). To prevail on a claim that a conviction was obtained by evidence that the State knew or should have known to be false, a defendant must show that the statements were actually false, the statements were material, and the prosecutor knew they were false. *Coe*, 161 F.3d at 343. In this case, the petitioner has not shown that Deputy Lawrence's trial testimony was actually false. Rather, he merely has alleged it, supporting this claim with Lawrence's failure to document the alleged confession in a report. The lack of documentation is a factor bearing on Lawrence's credibility, and the petitioner's trial counsel cross-examined Lawrence on that point. The jury had the information to consider in reaching its verdict. There is no evidence that the prosecutor knew of or deliberately elicited or failed to correct any perjury in this case. This Court is not persuaded

that the petitioner has shown that the prosecution knew or should have known that Lawrence's trial testimony against the petitioner was perjurious.

The petitioner also claims that the prosecutor engaged in misconduct by failing to identify Lawrence as a witness before trial. State law requires the prosecutor to provide the defendant with "a list of all witnesses known to the prosecuting attorney who might be called at trial." Mich. Comp. Laws § 767.40a. However, habeas relief is not warranted by violations of a state discovery law so long as the defendant was not denied a fair trial. The Sixth Circuit has explained:

> [S]uch a claim is not cognizable on habeas, because it is not a constitutional violation. *See generally* 28 U.S.C. § 2254(a) (providing that habeas corpus proceedings are available only for claims that a person "is in custody in violation of the Constitution or laws or treaties of the United States"). As we explained in *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988), the Supreme Court has consistently held that "'[t]here is no general constitutional right to discovery in a criminal case.'" *Id.* at 1281 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)). Rather, all the Constitution requires, per the due process clause, is that the defendant not be deprived of a fundamentally fair trial. *Id.* Thus, in *Presser*, this court concluded that neither the Constitution nor the Federal Rules of Criminal Procedure compelled pre-trial disclosure of any impeachment evidence related to the defendant's case. *Presser*, 844 F.2d at 1284. *Cf. United States v. Logan*, Nos. 97-5912, 97-5914, 1999 WL 551353 (6th Cir. July 19, 1999) (holding that the district court did not err in refusing to deny defendant's motion to bar testimony from government rebuttal witness or continue the trial because defendant was not entitled, under pre 1997 version of Fed. R. Crim. P. 16 or the Constitution, to discovery of a rebuttal witness). In short, there is no constitutional violation cognizable on habeas here.

*Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002). The petitioner has failed to show how the introduction of Deputy Lawrence's testimony deprived him of a fair trial. Lawrence did not testify in the State's case-in-chief; rather he testified as a rebuttal witness. Under these circumstances, the petitioner was not denied a fundamentally fair trial.

Finally, the petitioner claims the prosecutor engaged in misconduct by attempting to influence the jurors through seating the victim's family close to the jury box. In *Carey v. Musladin*,

-30-

__ U.S. __, 127 S.Ct. 649 (2006), a petitioner sought habeas relief on the grounds that at trial the victim's family "sat in the front row of the spectators' gallery" wearing buttons with the victim's picture on them. There was no allegation that the prosecutor encouraged the family members to wear the buttons. The Supreme Court unanimously rejected the petitioner's claim, holding that the state court's decision was not an unreasonable application of Supreme Court precedent because the Supreme Court had never held that spectator conduct could violate a defendant's right to a fair trial. Three concurring justices agreed with the result but disagreed with the majority's implication that distinguishing between conduct by the government or by spectators is relevant. Nonetheless, this Court must conclude that if family members in the front row wearing buttons with the victim's picture does not warrant habeas relief, then family members sitting in the front row without such buttons likewise does not.

The prosecutor's conduct did not deprive the petitioner of due process or a fair trial, and the state court's rejection of the petitioner's prosecutorial misconduct claims was not contrary to or an unreasonable application of Supreme Court precedent.

### G.

In his eighth claim, the petitioner alleges that his Fourth Amendment rights were violated by the introduction of evidence seized from his home without a warrant. It was not until his direct appeal that the petitioner raised this claim. The Michigan Court of Appeals held that the "evidence presented at trial demonstrates that the gun parts were seized from defendant's well house after defendant was arrested and the police entered his premises pursuant to a search warrant." *People v. Mendoza*, 2001 WL 824467, at *3.

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Sixth Circuit Court of Appeals utilizes a two-step analysis to determine whether a defendant was given a full and fair opportunity to litigate a Fourth Amendment claim in state court:

> First, the court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.

*Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir.2000) (internal quotations omitted).

Michigan provides ample opportunity for litigation of Fourth Amendment claims. Typically, such claims are addressed before trial via a motion to suppress. *See People v. Ferguson*, 376 Mich. 90, 93-94, 135 N.W.2d 357 (1965) (holding that motions to suppress must be timely made where the factual circumstances constituting the illegal seizure are known to the defendant in advance of trial). However, even absent objections in the trial court, Michigan appellate courts entertain Fourth Amendment claims where it appears that the evidence in question affected the outcome of the trial. *People v. Harris*, 95 Mich. App. 507, 509; 291 N.W.2d 97 (1980). In this case, the Michigan Court of Appeals reviewed the petitioner's claim despite his failure to file a motion to suppress before trial. The petitioner does not dispute that the Michigan courts provided him with a procedural mechanism to present his Fourth Amendment claim. He instead simply argues that the claim was incorrectly decided. The petitioner was provided with a full and fair opportunity to litigate his Fourth Amendment claim in state court, despite the fact that he raised it for the first time on direct appeal. Therefore, his claim is barred in this habeas proceeding by the rule in *Stone v. Powell*.

-32-

H.

In his tenth habeas claim, the petitioner alleges that trial counsel was ineffective by failing to (1) continue to request dismissal of the malicious destruction of property charges; (2) investigate a claim of entrapment; (3) procure a change of venue; (4) question jurors about discussing the case before closing arguments; and (5) move for a mistrial.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688; internal quotes omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient

-33-

performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

1.

The petitioner first argues that his counsel was ineffective in failing to continue to request dismissal of the malicious destruction of property charges. At the preliminary examination, the petitioner's trial counsel moved the court to quash that charge. The magistrate denied the motion. There is no reason to believe the trial court would have ruled differently if the petitioner's counsel had asked again. The petitioner therefore cannot show that he was prejudiced as required by *Strickland*, 466 U.S. at 687.

2.

The petitioner next asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to investigate a defense of entrapment.

> The "objective" theory of entrapment focuses on the conduct of the government, rather than individual predisposition, and has been consistently raised as an alternative formulation of the entrapment defense in concurring or dissenting opinions by Supreme Court justices. *See, e.g., United States v. Russell*, 411 U.S. 423, 439-50, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (Stewart, J. dissenting). Under this theory, entrapment occurs when the government induces or instigates the commission of a crime by one not ready and willing to commit it, rather than merely providing the opportunity to commit a crime. *Id.* at 445, 93 S.Ct. 1637. Michigan has adopted the objective theory of entrapment. *See People v. Juillet*, 439 Mich. 34, 475 N.W.2d 786, 792-93 (1991).

*Sosa v. Jones*, 389 F.3d 644, 647 (6th Cir. 2004).

It is well-established that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see also Wiggins*, 539 U.S. at 524-29 (holding that the abandonment of an investigation at an unreasonable juncture may prevent counsel from making an informed strategic decision);

-34-

*Parrish v. Towns*, 395 F.3d 251, 258 (6th Cir. 2005).   Courts give considerable deference to counsel's reasonable strategic decisions.   *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

The notion that a government agent somehow induced the petitioner to assault his erstwhile love interest with an automobile and shortly thereafter with a firearm is ludicrous.   Defense counsel certainly is not obliged to chase every wild goose and traverse each blind alley in a quixotic quest for fanciful defenses.   The petitioner has not established that trial counsel would have discovered favorable defense evidence even if counsel had conducted a more thorough pretrial investigation. To be entitled to habeas relief, a petitioner must identify "exculpatory evidence or additional defensive theories that would have been discovered or developed had his counsel investigated the case more thoroughly."   *Flores v. Johnson*, 957 F. Supp. 893, 913 (W.D. Tex. 1997).   Absent a showing that further investigation would have revealed evidence capable of altering the result at trial, the prejudice prong of *Strickland* is not satisfied.   *Harbison*, 408 F.3d at 830.   The petitioner in this case has made no showing that favorable evidence or defenses existed.   Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief.   *See, e.g., Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998).   This Court is unable to discern any basis for an entrapment defense in this case.   Habeas relief is not warranted on this claim.

3.

The petitioner next argues that his counsel was ineffective by failing to obtain a change of the trial venue.   The petitioner states that threats received by four jurors justified such a change. However, the Court can find no evidence in the record that any juror received threats.   In addition,

-35-

the petitioner's counsel did request a change of venue due to publicity in the community, but the motion was denied. The petitioner has not explained what more his counsel could have done in order to obtain a change of venue. Moreover, the record reveals that a thorough voir dire was conducted, and each juror stated he or she could decide the case solely on the evidence presented at trial. The petitioner has presented no additional facts that would justify a change in venue, and therefore he cannot meet the prejudice requirement of *Strickland*. Because there were no grounds to change venue, the petitioner's counsel was not ineffective for failing to obtain such a change.

4.

The petitioner finally argues that his counsel was ineffective for failing to question jurors about discussing the case before closing arguments or move for a mistrial based on such discussions. However, the petitioner has failed to show that the jurors were discussing the case before closing arguments. The record reveals that during the presentation of the defense's case, the trial court received a note from a juror with a question. The trial judge then warned the jurors that they must wait until all evidence had been presented before beginning deliberations:

> Other things I indicated you cannot discuss the case with anyone, including your – your family, your friends. You can't even discuss it with other jurors until it comes time to hear the case. When it is time, we will give you the instructions and you have the final instructions. That is the time which you will be allowed to discuss the case and consider your deliberations.

Trial Tr. vol. III, 396, July 22, 1999. The court's instruction to the jury was sufficient to cure any prejudice that might have occurred as a result of pre-deliberation discussions. There was no reason to conduct further questioning of the jury or to order a mistrial, and the petitioner's counsel was not ineffective for failing to do so.

I.

-36-

In the petitioner's sixth claim, he alleges that the trial court judge was biased against him. The petitioner's ninth habeas claim is that the trial court erred by not instructing the jury on any lesser included offenses. The Michigan Court of Appeals rejected these claims because the petitioner did not move to disqualify the judge, nor did he request instructions on the lesser included offenses. The court of appeals wrote that the trial judge bias issue "is not properly before this Court because defendant did not move for disqualification of the trial court pursuant to MCR 2.003(C)." *People v. Mendoza*, 2001 WL 824467, at *4. The court "similarly reject[ed] defendant's claim that the trial court erred by not instructing the jury on any lesser included offense where none were requested." *Id.* at n.4.

In his eleventh habeas claim, the petitioner alleges that his constitutional rights were violated because the trial court failed to correct his presentence report. In his twelfth, thirteenth, and sixteenth habeas claims, the petitioner alleges due process and other double jeopardy violations. In his fifteenth habeas claim, the petitioner alleges that the voir dire transcripts he received were inaccurate and that his appellate counsel was ineffective in failing to investigate claims related to his presentence report. These claims were first raised in the petitioner's appeal of the trial court's denial of his motion for relief from judgment, and the Michigan Court of Appeals denied the petitioner's appeal based on Mich. Ct. R. 6.508(D).

All these claims are procedurally defaulted. When the state courts clearly and expressly rely on a valid state procedural bar, federal habeas review is also barred unless the petitioner can demonstrate "cause" for the default and actual prejudice as a result of the alleged constitutional violation, or can demonstrate that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). If the petitioner fails

to show cause for his procedural default, it is unnecessary for the court to reach the prejudice issue. *Smith v. Murray*, 477 U.S. 527, 533 (1986).  In an extraordinary case, where a constitutional error has probably resulted in the conviction of one who is actually innocent, a federal court may consider the constitutional claims presented even in the absence of a showing of cause for procedural default. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  However, a claim of actual innocence must be supported with new, reliable evidence that was not presented at trial.  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Actual innocence, which would permit collateral review of a procedurally defaulted claim, means factual innocence, not mere legal insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In this case, the Michigan Court of Appeals held that by failing to raise these various issues on direct appeal, the petitioner had not preserved these claims.  This is an independent state procedural rule that is adequate to support the state judgment.  *See Lee v. Kemna*, 534 U.S. 362, 375 (2002) (holding that whether the independent state ground is adequate to support the judgment is itself a federal question).

Regularly followed state procedural rules were in place that the petitioner failed to observe. For instance, Michigan Court Rule 2.003(C) states that "a motion to disqualify must be filed within 14 days after the moving party discovers the ground for disqualification.  If the discovery is made within 14 days of the trial date, the motion must be made forthwith."  Mich. Ct. R. 2.003(C). Further, state law requires a defendant seeking a jury instruction on a lesser included offense to request one.  "The first condition for a lesser included offense instruction is a proper request.  This requirement is not novel or extraordinary."  *People v. Beach*, 429 Mich. 450, 482, 418 N.W.2d 861, 876 (1988).  The failure to make contemporaneous objections is a recognized, firmly established,

and independent and adequate state law ground for refusing to review trial errors. *Coleman*, 501 U.S. at 750-51. Moreover, Michigan Court Rule 6.508(D) bars relief where a criminal defendant "alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion" without good cause. The Michigan courts actually enforced the procedural rules in this case. The court of appeals explicitly rejected these claims because the petitioner failed to raise them in the trial court or in earlier motions.

The Court may only consider these claims if the petitioner can show cause and prejudice or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. The petitioner states in his tenth claim that his attorney was ineffective in failing to request jury instructions on the lesser included offenses. As noted above, the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

The petitioner states his trial counsel should have requested jury instructions on assault with intent to do great bodily harm and felonious assault. However, defense counsel's failure to request these jury instructions was objectively reasonable and can be relegated to sound trial strategy. The defense's theory was that the petitioner was mentally ill and incapable of forming the requisite intent. A jury instruction on other charges that require proof of intent could have been perceived by the jury as inconsistent with the petitioner's defense, and the decision to forego the instruction was not objectively unreasonable. The petitioner has not met his burden of rebutting the

presumption that the decision not to object to the jury instructions was sound trial strategy or that the failure to object prejudiced him.  The petitioner is not entitled to habeas relief on this ground.

The petitioner has not offered any cause for his failure to advance his other claims. Moreover, he has failed to establish any miscarriage of justice.  The Court therefore finds that these claims are procedurally defaulted, and the petitioner is not entitled to habeas relief.

III.

The petitioner has not established that he is in the State of Michigan's custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  January 4, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 4, 2007

s/Veverlyn Foster-Sims
VEVERLYN FOSTER-SIMS

---